EDWARD A. BARNARD & *al. versus* SAMUEL WHEELER & *al.*

AND

SAMUEL WHEELER & *al: versus* EDWARD A. BARNARD & *al.*

If the master of a vessel in his bill of lading for goods received on freight inserts a price for the transportation, and in so doing acts under a clear mistake, in supposing that price had been agreed on with the owners, when the fact was otherwise, it will not be obligatory on the owners; especially if the mistake was occasioned by the mismanagement of the party insisting upon taking advantage of it.

If the shipper of goods on freight contracts for the price thereof with the general agent of the owner of the vessel, having reason to know, that although his agency might be general, yet that his authority was restricted in that particular instance, the shipper cannot claim to have the terms of the contract fulfilled as against the principal of such agent.

Nor will such contract of the agent be ratified by the principal by an omission to give notice of his disaffirmance of it, until after he can possess himself of complete knowledge as to how the contract came to be made, and how it would affect his interests.

If the owner of a vessel detains goods transported in her for their freight, and they are wrongfully taken out of his possession by a writ of replevin, an action of assumpsit, commenced during the pendency of the action of replevin, may be supported against the owner of the goods for their freight.

Should a tender of the freight money, alleged to be due, be made to a mere servant of the owner of the vessel in whose custody the goods were placed for safe keeping only, such servant has no power to waive any rights of his employer in relation thereto.

When goods detained by the owner of a vessel for the payment of the freight, have been wrongfully taken from him by the owner of the goods by means of a writ of replevin, if the owner of the vessel brings an action of assumpsit for the freight, and attaches other goods to secure the demand, the lien upon the goods for the freight is not thereby discharged.

THESE cases were both opened to the jury as one, and after the evidence on the one side and on the other had been introduced or offered, the parties agreed, that the case should be taken from the jury, and submitted to the decision of the Court, upon a report of the evidence by the presiding Judge; with power to make such inferences as a jury might properly make upon the proof, or upon so much thereof as should be legal evidence in the case. And the Court were to enter a default or nonsuit in each of the cases, and judgment according to the rights of the parties.

The facts, considered by the Court to be proved by the evidence, are stated in the opinion.

These cases, both as to the facts and the law arising thereupon, were argued by

*J. Granger,* for Barnard & Pike; and by

*Hayden,* for Wheeler & Sons.

*Granger,* in his argument, in support of his position, that if Wheeler & Sons had a lien on the goods of Barnard & Pike for the freight, it was discharged by the tender, cited 5 T. R. 409. That the Master's contract for freight, evidenced by the bill of lading signed by him, was binding upon the owners. Abbott on Shipping, 92; 4 Campb. 298; 8 Maine R. 356; 14 Maine R. 183; 17 Maine R. 153; 11 Mass. R. 91; 6 Cowen, 173. And the same authorities show, that the contract of W. P. Wheeler, the agent of the owners, was binding upon them. The letter of Wheeler & Sons to W. T. Wheeler was a mere letter of information, and not a binding contract, or even a restriction of the authority of the agent. A mere *ex parte* offer, not accepted, can bind no one. 16 Maine R. 458. The owners of the vessel had no right to call on Barnard & Pike for freight of Curtis' goods, and certainly no lien on their goods for the payment thereof. Abbott on Shipping, 247; Montagu on Lien, 55. Whether the tender was sufficient or not in amount is immaterial, as it was refused, on the ground, that the money would not be received, unless a receipt given, was produced; a condition he had no right to require. 4 Mass. R. 91; 15 East, 547. If the owners of the vessel had a lien, and if it had not otherwise ceased to exist, it was discharged by the bringing of their action for the freight, and attaching the goods of Barnard & Pike to secure the whole amount. 5 Pick. 178; 12 Petrsd. Abr. 206 and cases there cited; 2 Harrison's Dig. 1452. In the suit in favor of Wheeler & Sons against Barnard & Pike, the defendants offered to be defaulted for $200, and the interest. Therefore, whether the tender was good or not, the action cannot be maintained for a greater sum, if the contract made by the

agent of the owners, and sanctioned and adopted by the master, and even adopted by the owners, by their neglecting to give seasonable notice of their disaffirmance of the acts of their agents, is binding.

*Hayden*, in his argument, cited in support of his position, that as this was not a general ship, the master has no right to make a contract for freight, and cannot bind the owners thereby. Abbott on Shipping, 92, 95, 98; 4 Greenl. 407; 19 Johns. R. 235; 11 Mass. R. 99; Story on Agency, 37. If the owners have made a special contract, the master has no power to alter it. Abbott, 99. If the master had authority, it was personal to himself, and he could not delegate it to another. Story on Agency, 14, 15, 38, 39. If W. T. Wheeler was the general agent of Wheeler & Sons, he had no right to vary from special instructions; and inasmuch as Barnard knew what those instructions were, he had notice sufficient to put him on his guard. Barnard having seen one of the firm but two days before he made the bargain with W. T. Wheeler, had notice that such one would not be approved by the owners; and therefore Barnard should not have induced W. T. Wheeler to make it, and cannot hold the owners to it. The contract cannot bind the owners, because he was guilty of misrepresentation, and had he made known the facts, W. T. Wheeler would never have made such bargain. The plaintiffs cannot now say, that they tendered as much as the freight of their own goods came to, for their tender was as per bill of lading; and if accepted, would have authorized them to receive to their own use the freight from Curtis. 2 Metc. 283; 18 Pick. 414; 8 Mass. R. 365. The tender, too, was conditional, and so not good. 12 Mass. R. 450.

The opinion of the Court was drawn up by

Whitman C. J. — The first of these actions is replevin for sixty-seven barrels of flour; and the other is assumpist for the freight of a cargo of flour, corn, &c. of which the sixty-seven barrels were a part. The first was commenced by the general owner of the cargo, against the defendants, as owners of the

vessel, in which the cargo was imported; who claimed a right to detain the sixty-seven barrels till the freight demanded by them was paid. Barnard & Pike, the plaintiffs, having tendered the amount alleged by them to be due, but not the amount claimed by Wheeler & Sons, the defendants, and for that reason not accepted by them, and, thereupon, having demanded the sixty-seven barrels of Wheeler & Sons, and the same not being delivered, this suit was instituted.

The flour detained, having been taken from the possession of the master of the vessel, in which the same was imported, by the action of replevin, Wheeler & Sons instituted their action of assumpsit to recover the amount of the freight supposed by them to be due.

The evidence in both suits being nearly or quite identical, they were opened together to the same jury; but, upon a development of the evidence, the causes were taken from the jury; and the parties agreed, that the Judge presiding should report the evidence for the consideration of the whole Court; and that such inferences might be made by the Court, as a jury might make from the facts proved; and thereupon such adjudication should be made as might be in conformity to the legal rights of the parties, upon nonsuit or default.

It appears that Wheeler & Sons, on or about the first of September, 1840, had despatched the vessel, called the Sultan, with a cargo of plaster, &c. to Wilmington, (Del.) and on that day Barnard, one of the firm of Barnard & Pike, took from Wheeler & Sons an open letter, addressed to W. T. Wheeler, then residing and doing business at Wilmington, in which it was stated by Wheeler & Sons, that they had agreed with Barnard & Pike to take, in the Sultan, what corn and flour they might wish; they to fill her up, if desired, at twenty-five cents per barrel for flour, and five cents per pushel for corn; and to load at Philadelphia, if desired, to be delivered at Calais, Maine; provided Barnard should arrive in time to meet the vessel on her arrival out. Barnard arrived in Philadelphia, and also at Wilmington, before the Sultan reached the latter place. At Philadelphia he shew his open letter to the corres-

pondents of Wheeler & Sons; and also met there one of the firm of Wheeler & Sons, with whom he had various conversations, in which he made repeated endeavors to induce him to agree to a reduction of the terms for freight, contained in their letter to W. T. Wheeler; but such alteration was peremptorily refused. Afterwards, and before the Sultan had arrived, this member of the firm left Philadelphia; and Barnard, thereupon, proceeded to Wilmington; and there delivered the open letter, and insisted, that there had been no agreement as to the freight; and made no communication of his interviews with, and endeavors to induce one of the firm of Wheeler & Sons to reduce the price of the transportation of the flour and corn, and thereupon induced W. T. Wheeler, who had been the correspondent, and consignee generally, of Wheeler & Sons, at Wilmington, and was the son of one, and the brother of the others of them, to sign a written agreement, that the whole vessel should be let to Barnard & Pike, to transport corn, flour and coal from Philadelphia to Calais, for two hundred dollars, unless they should prefer to pay twenty-five cents per barrel for flour, and five cents per bushel for corn, and one dollar and seventy-five cents per ton for coal, in lieu of the two hundred dollars, payable at Calais on delivery of the cargo.

On the arrival of the Sultan at Philadelphia she was fully laden by Barnard with corn, flour, bread, cigars, tobacco, yarn, coffee, shot, apples and oakum; and the captain, as must be presumed, supposing the agreement with W. T. Wheeler to be obligatory, signed bills of lading in conformity to it. The cargo arrived at Calais, and was there delivered, with the exception of the sixty-seven barrels of flour, which were detained to secure the payment of a reasonable freight for the items of the cargo imported, amounting, as was claimed, to a considerable amount beyond the $200, tendered; and it does not seem to have been questioned, that a reasonable freight would have exceeded the amount tendered; for the defence was based wholly upon the supposed obligatory effect of the agreement with W. T. Wheeler. If the two hundred dollars would have been adequate to a reasonable freight, it is not

conceivable, that such ground would not also have been insisted on.

That Wheeler & Sons might cause the flour to be detained till such freight, as was actually due, was advanced or tendered is undeniably true; and that two hundred dollars was in fact tendered for it seems to have been placed beyond a doubt; and if no more was due for it the action of replevin is sustained. And this depends on whether the contract with W. T. Wheeler was obligatory upon Wheeler & Sons. If it was not, then there was no other contract concerning the price of transportation, than what can be gathered from the letter, borne by Barnard to W. T. Wheeler, and the conversation between Barnard, and one of the firm of Wheeler & Sons, in Philadelphia, and the ordinary price of such transportation. If the agreement signed by W. T. Wheeler was not valid, as against Wheeler & Sons, aside from the bills of lading signed by the master, it cannot be regarded as confirmed by them. For they were evidently made under the apprehension, on the part of the master, that it was imperative upon him, as to the amount of freight to be exacted. For the delivery of the cargo, as described in the bills of lading, his undertaking was absolute; but, in reference to the freight to be paid, which is a matter regulated more frequently by the owners of the vessel and of the cargo, and which they may always control, if he has reason to suppose they have done it, he may, as was done in this case, refer to what he may suppose they have done to regulate it. If clearly under a mistake in so doing, it would not be obligatory upon the owners; especially if the mistake should appear to be owing to the mismanagement of the party insisting upon taking the advantage of it.

It becomes important now to inquire, whether W. T. Wheeler, in making the agreement signed by him, had authority, under the particular circumstances of the case, to bind Wheeler & Sons to the performance of its stipulations. That W. T. Wheeler had authority generally to act as agent for them, in reference to the employment of vessels sent or consigned by them to him, when not restricted by particular orders, his tes-

timony renders it at least presumable.  If Barnard had gone
to him, without being the bearer of the letter, which he de-
livered to him, and without having had conversation with
Wheeler & Sons, or either of them, such an agreement might
have been conclusive upon them.  But the case here is differ-
ent.  From the terms of the letter he must have known what
Wheeler & Sons understood to be agreed upon as to the rate
of freight to be exacted; and W. T. Wheeler would doubtless
have so understood it, but for the affirmation of Barnard to
him, that no terms had been agreed upon as to freight.  And
Barnard, at the same time, concealed from him the explicit
refusal of one of the firm of Wheeler & Sons, a few days
before, in Philadelphia, to vary the terms contained in the
letter.  Barnard, therefore, could but have known, that, what-
ever W. T. Wheeler's general power as an agent might be, in
this particular, it was not the intention of Wheeler & Sons to
have the question of the freight of the Sultan, as between
Barnard & Pike, and themselves, referred to him.  And ob-
taining such an agreement under such circumstances cannot
be regarded as ingenuous and fair dealing between mercantile
men.  If Barnard had not only delivered the letter to W. T.
Wheeler, but had stated to him what had passed between him-
self and one of the firm of Wheeler & Sons, in Philadelphia,
taking that in connexion with the contents of the letter, it may
well be doubted if W. T. Wheeler would ever have assented
to such an agreement; and it may well be apprehended that
such was the impression on the part of Barnard; and that it
was, therefore, purposely withheld.  But, whether there were
*mala fides* on the part of Barnard or not, if he contracted with
W. T. Wheeler, having reason to know that, although his
agency might be general, yet that his authority was restricted
in this particular instance, he cannot claim to have the terms
of the contract fulfilled as against his principals.  Abbott by
Story, 134.  We think, therefore, that the contract entered
into between Barnard & Pike and W. T. Wheeler, was not
obligatory upon Wheeler & Sons; and that the bills of lading
made under such circumstances should not be conclusive upon

them, as to the amount of freight to be exacted; and that a reasonable freight was due to them. And, it being reasonable to conclude that such freight would have exceeded the sum of two hundred dollars, the right of detention by Wheeler & Sons, or by their agent, the master of the Sultan, at the time the action of replevin was commenced, had not ceased, and therefore, that, that action is not sustainable. The plaintiffs in it must become nonsuit.

But it appears that Wheeler & Sons, after the flour detained had been wrongfully taken out of their possession, by the replevin suit, commenced their action of assumpsit for the freight, in which a default must be entered; and judgment be entered for the amount, which may appear to be due. In such case it would not be reasonable to order a return of the property replevied, till it shall be ascertained that the remedy in assumpsit, on execution, shall fail of being complete. The action of replevin, under a nonsuit, may, therefore, be continued to await the further order of Court in reference to an order of return.

Several points, however, were insisted upon at the argument, which it may be expected that we should notice. One was, that Wheeler & Sons must be regarded as having ratified the contract, made by W. T. Wheeler, by not giving notice of a repudiation of it before the Sultan arrived at Calais. It appears that they must have received notice by letter from W. T. Wheeler, that such a contract had been made, some week or two previous to the arrival of the Sultan. It does not appear, however, that they had any notice of what Barnard & Pike had put on board of her anterior to her arrival; nor, until such arrival, and an interview with the master, could they become fully aware of all the circumstances under which the shipment had been made. Knowing, as may be believed, that the contract had been entered into directly at variance with what had been expressly in contemplation, and well understood by the parties in personal interviews between themselves, they might well be allowed to wait till they could possess themselves of complete knowledge, as to how the contract came to be

made, and how it would affect their interests, before coming to a conclusion to renounce it. In such case the renunciation would seem to have been in season.

Another ground insisted upon was, that a tender of two hundred dollars, made to one Greene, with whom the sixty-seven barrels of flour had been deposited for safe custody, who did not object to delivering it because the tender was not sufficient, was effectual to destroy the right of lien in Wheeler & Sons, or in the master as their agent. But it does not appear that Greene had any authority to receive the freight. The flour was with him for safe custody only. He was but a servant employed for a particular purpose. The tender should have been made to the master, or to Wheeler & Sons. Whatever may have been the manner of Greene's refusal to receive the two hundred dollars, it could in nowise affect the rights of Wheeler & Sons. That such storage was proper in such case is fully established by authority. Abbot by Story, 282.

Again, it was insisted, that Wheeler & Sons, by bringing an action of assumpsit for the freight, have waived their right of lien ; and authorities were cited in support of that position ; but they cannot be considered as maintaining it. If Wheeler & Sons had caused the identical flour to be attached, it might have been otherwise. In Story on Agency, 393, it is laid down, that an agent, having a lien upon property belonging to another person, has his remedy as well *in personam* as against the property ; and that he trusts both to the fund, and to the person of his principal. If, however, the lien be in the nature of a pledge for a debt, according to some authorities, *( Corlies* v. *Cummings,* 6 Cowen, 181,) it may be that the fund should first be exhausted, before a resort should be had to the person of the pledgor. But if the general owner of property, so situated, should by replevin, or otherwise, deprive the lien holder of his rightful possession, he would unquestionably subject himself to an action for the amount due, without regard to the property pledged. Mr. C. J. Shaw, however, in delivering the opinion of the Court, in *Beckwith* v. *Sibley & al.* 11 Pick. 482, says, the creditor, "notwithstanding the

pledge, or collateral security, may look to the general credit of his debtor, and have his action, unless there is some agreement or contract, express or implied, to give time, or to look to a particular fund." It would follow much more conclusively, where a mere detention was authorized, as in case of a simple lien, in which no right of sale exists, that a right of action exists simultaneously with the detention. And most clearly such right of action, without impairing the right of lien, must exist when the general owner, who is the debtor, has unjustifiably deprived a simple lien holder of the custody of the property detained.

It was further urged, that Wheeler & Sons had no right to detain the property of Barnard & Pike, for the freight of goods shipped on board the Sultan for one Curtis; and that, deducting the freight due for the transportation of his goods, the tender of two hundred dollars would have been to the full amount of the residue of the cargo, whether calculated upon the principle of a reasonable freight or otherwise; and it may be that such would have been the case. But, on looking at the bill of lading of the goods shipped to Curtis, we find, that the freight of those goods was made payable, not to the master, nor to Wheeler & Sons, but to Barnard & Pike. And, on looking into the evidence, we find, that the freight of those goods was claimed and received by Barnard & Pike. We cannot doubt, therefore, but that the bill of lading of those goods was so filled up and signed by the master at the instigation of Barnard, at Philadelphia, under the impression, on his part, and on the part of the captain, that the whole vessel, by the run, was let to Barnard & Pike. They, therefore, must be regarded as having undertaken for the carriage of these goods; and, therefore, in effect, as the shippers of them to Curtis, and, after having exacted and received the freight therefor, of him, it is too late for them to insist that they are not responsible to Wheeler & Sons for the freight of the whole cargo.